1

**WO**

2

3

4

5

6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE DISTRICT OF ARIZONA

8

9    Steven Spiker and Denise Spiker, husband
     and wife,                                          No. CV-13-00334-PHX-GMS

10
                           Plaintiffs,                  **ORDER**
11

12   v.

13   Sanjivan PLLC, an Arizona professional
     limited liability company dba Buckeye
14   Medical Clinic; Karen Padilla; John Doe
     Padilla; Wal-Mart Stores Incorporated, a
15   Delaware    corporation;    Wal-Mart
     Transportation LLC, a foreign LLC; Wal-
16   Mart Associates Incorporated, a Delaware
     corporation; Stephen Kracht, D.O.; and
17   EScreen   Incorporated,   a   Delaware
     corporation,
18
                           Defendants.
19

20         All Defendants move to dismiss Plaintiffs' Second Amended Complaint for failure

21   to state a claim pursuant to Rule 12(b)(6). (Docs. 19, 20, 21.) For the reasons specified

22   below, the Motion of Defendant Wal-Mart is granted in part and denied in part, the

23   Motion of Defendants BMC and Padilla is denied, and the Motion of Defendants eScreen

24   and Dr. Kracht is granted in part and denied in part.[1]

25

26   _____

27        [1] The request for oral argument by Defendants BMC and Padilla is denied because
     the Parties have had an adequate opportunity to discuss the law and evidence, and oral
28   argument will not aid the Court's decision. *See Lake at Las Vegas Investors Grp. v. Pac.
     Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

**BACKGROUND**

This case arises out of an employee drug test that revealed the existence of banned substances and led to the termination of the employee. Plaintiff Steven Spiker was employed as a truck driver for Defendant Wal-Mart for approximately seven years.[2] (Doc. 14, Sec. Am. Compl. ¶ 31.) Truck drivers are subject to the Federal Omnibus Transportation Employee Testing Act (the "FOTETA") and the implementing Department of Transportation ("DOT") regulations. 49 U.S.C. §§ 45101, *et seq.* Defendant eScreen, a Third-Party Administrator ("TPA"), provided bundled drug testing services to Wal-Mart. (Doc. 14 ¶ 8.) eScreen handled the selection, hiring, training, and/or supervision of collection sites and medical review officers ("MROs"). (*Id.* ¶¶ 10–11.)

On September 2, 2011, Mr. Spiker was directed by Wal-Mart to submit to a random DOT drug test at a collection site, Defendant Buckeye Medical Clinic ("BMC"). (*Id.* ¶ 34.) Mr. Spiker reported to BMC and provided a urine specimen to BMC's employee, Defendant Karen Padilla. (*Id.* ¶¶ 35, 37–38.) At the time, the Complaint alleges that Padilla was not credentialed or trained pursuant to the DOT regulations. (*Id.* ¶ 38.) Padilla affixed a tamper-evident seal on Mr. Spiker's specimen bottle after Mr. Spiker initialed it. (*Id.* ¶ 37.) Padilla prepared the specimen, completed a Custody and Control Form ("CCF") that Mr. Spiker certified, and sent the specimen and the CCF to a laboratory. Padilla's handling of Mr. Spiker's specimens led to them being contaminated or mistakenly identified. (*Id.* ¶ 69.) At the laboratory, the specimen tested positive for banned substances. (*Id.* ¶ 43; Doc. 20-1, Ex. 1.) Defendant Stephen Kracht, D.O., the MRO, reviewed the CCF and the laboratory's findings but did not discover any flaws therein. (Doc. 14 ¶ 39.)

Upon receiving notice of the positive drug test report, Mr. Spiker complained

---

[2] The Court takes as true the allegations contained in the Spikers' Second Amended Complaint at this stage of the litigation. *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).

about the report and the drug testing process to Defendants but they did not invalidate the report. (*Id.* ¶ 45.) As a result of the report, Wal-Mart terminated Mr. Spiker's employment. (*Id.* ¶ 46.) Further, Mr. Spiker's commercial driving record on file with the DOT was impacted negatively by the drug test. (*Id.* ¶ 48.) He is now subject to additional restrictions and requirements from the DOT. (*Id.* ¶ 50.) Prior to his termination, Spiker earned an annual salary of $92,500 with additional health and retirement benefits. (*Id.* ¶ 31.) Following his termination, Mr. Spiker was unemployed for approximately eight weeks. (*Id.* ¶ 51.)  Although he found new employment, it was at a lower salary of $45,000 and a lower level of health and retirement benefits. (*Id.* ¶ 52.)

Mr. Spiker and his wife, Denise Spiker, brought an action against Defendants in the Maricopa County Superior Court on April 6, 2012. (Doc. 1-3.) The Spikers had named Clinical Reference Laboratory as a Defendant in the original state court complaint but removed the party in their amended complaint. (Docs. 1-1, 1-3.) Dr. Kracht removed the action to this Court on February 14, 2013, and all Defendants stipulated to the removal. (Doc. 1.) On April 2, the Spikers filed a Second Amended Complaint (the "SAC") alleging claims of negligence against all Defendants and negligent training and supervision against Wal-Mart, eScreen, and BMC. (Doc. 14 ¶¶ 58–80.) All Defendants now move to dismiss the SAC.

## DISCUSSION

## I.  MEET AND CONFER

The Court ordered the Parties to "meet and confer prior to the filing of a motion to dismiss to determine whether it can be avoided." (Doc. 3 at 1.) The Court further ordered that "motions to dismiss must contain a certification of conferral indicating that the parties have conferred to determine whether an amendment could cure a deficient pleading, and have been unable to agree that the pleading is curable by a permissible amendment. . . . Motions to dismiss that do not contain the required certification are subject to be stricken on the Court's motion." (*Id.* at 1–2.)

Defendants BMC, Padilla, eScreen, and Dr. Kracht did not attach a certification of

conferral to their Motions. After the Spikers alerted the Court to that deficiency in their Response, Defendants attached a joint certification to their Reply briefs. (Doc. 36-1, Ex. 10.) In this circumstance, and because the requirement is new, the Court will review the adequacy of the certification.

In the certification, Defendants contend that they participated in "lengthy and numerous discussions with Plaintiffs' counsel with respect to deficiencies in Plaintiffs' [First Amended Complaint] prior to filing of their Motions to Dismiss." (*Id.* at 2.) Defendants further contend that all parties participated in a conference call on March 2, 2013, to discuss each party's respective issues with the First Amended Complaint and whether any deficiencies could be cured through amendment. The Spikers argue, however, that at the time of the March 2 conference, Wal-Mart was the only party that had filed a Motion to Dismiss and only issues that pertained to that Motion were discussed at the conference; none of the issues presented in Defendants' other Motions were raised at that time.

In addition to the March 2 conference, Defendants state that eScreen and Dr. Kracht have had "numerous other phone calls and exchanged multiple emails with Plaintiffs' counsel on other deficiencies with Plaintiffs' [First Amended Complaint]." (*Id.*) At the end of this exchange, "the parties agreed to disagree as to some other issues of law with the understanding that each party would be filing motions to dismiss after [the SAC] was filed." (*Id.*)

Although the Parties dispute what issues were raised in the March 2 conference, it is not disputed that Defendants have conferred with the Spikers regarding deficiencies in the First Amended Complaint and that the Spikers have once amended their Complaint in response to those conversations. Defendants may not have informally raised every issue pertinent to the Complaint that is raised in their Motions but the obligation to meet and confer does not include an obligation to assist the Spikers in carefully drafting a second amended complaint. The Court finds that the Defendants complied with their obligation to meet and confer with the Spikers prior to filing their Motions and will consider the

merits of Defendants' arguments.

## II.     LEGAL STANDARD

Rule 12(b)(6) is designed to "test the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When analyzing a complaint for the failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

## III.    EXHAUSTION

The general rule is that parties must exhaust prescribed administrative remedies before seeking relief from the federal courts. *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992) (internal citations omitted); *Minor v. Cochise Cnty.*, 125 Ariz. 170, 172, 608 P.2d 309, 311 (1980) ("It is a well recognized principle of law that a party must exhaust

his administrative remedies before appealing to the courts."). The rule "is a salutary one allowing agencies to exercise their expertise, to correct their own errors, and to provide relief that may be both swifter and more satisfactory than relief available through more formal litigation." *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 878 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 1540, 182 L. Ed. 2d 161 (2012). "Notwithstanding these substantial institutional interests, federal courts are vested with a virtually unflagging obligation to exercise the jurisdiction given them. *McCarthy*, 503 U.S. at 146 (internal quotation marks and citation omitted). Therefore, exhaustion may not be required "in some circumstances even where administrative and judicial interests would counsel otherwise." *Id.* "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look beyond the pleadings and decide disputed issues of fact." *Wyatt v. Terhune*, 315 F.3d 1108, 1119–20 (9th Cir. 2003).

Wal-Mart contends that Mr. Spiker did not exhaust his administrative remedies before seeking relief from this Court. One of these remedies is to complain to the Chief Safety Officer of the Federal Motor Carrier Safety Administration (the "FMCSA") that a "substantial violation" of the FOTETA and the DOT regulations is occurring or has occurred within the preceding 60 days. *See* 49 C.F.R. § 386.12(a). A substantial violation is defined as "one which could reasonably lead to, or has resulted in, serious personal injury or death." *Id.* The Officer has the discretion to initiate proceedings and investigate the complaint if it meets that standard. *Id.* § 386.12(b). The other administrative remedy is that an employee may request a test of the split specimen within 72 hours of being notified by the MRO that the employee has a verified positive drug test. *Id.* § 40.171(a).

The Supreme Court has recognized that the interests of the individual may weigh heavily against requiring administrative exhaustion before filing suit if "an administrative remedy may be inadequate because of some doubt as to whether the agency was empowered to grant effective relief." *McCarthy*, 503 U.S. at 147. Mr. Spiker was not able to obtain relief from the FMCSA by filing a complaint pursuant to Section 386.12. Wal-Mart's alleged negligence did not amount to a "substantial violation" or relate to a "fatal

flaw" under Section 40.199 triggering cancellation of Mr. Spiker's drug test. The remedy would not redress a complaint of negligence below that level. Further, even if Mr. Spiker had requested a split specimen test from the MRO it would not have accounted for the alleged flaws in his drug test that supposedly led to a positive result: the mislabeling or belated sealing of his specimens. Had Mr. Spiker pursued administrative remedies before filing suit rather than afterwards, they would have proven futile.

The inadequacy of the remedies to redress the alleged conduct are further evidenced by an FMCSA letter sent to Mr. Spiker in response to his July 8, 2012 request for an administrative hearing. An FMCA Associate Administrator replied on August 7 that "the FMCSA does not offer administrative hearings to challenge positive drug test results." (Doc. 29-1, Ex. A.) More importantly, he explained that "[t]he only person who can change the outcome of a DOT drug test is the [MRO]" but that "[Mr. Spiker's] noncompliant allegations involving the collector are not sufficient, even if proven, to cancel the DOT positive drug test result." *Id.* He advised Mr. Spiker to instead consider pursuing civil litigation if he had evidence to support his allegations. *Id.* On May 14, 2013, the Office of the General Counsel of the DOT confirmed that Mr. Spiker had exhausted remedies provided by the DOT regulations. (Doc. 29-1, Ex. B.)

Because the administrative remedies were inadequate to address the Spikers' negligence claims against Wal-Mart, Mr. Spiker was not required to exhaust them before filing this action. The Spikers may seek relief for Wal-Mart's alleged negligence in this Court.

## IV. WRONGFUL TERMINATION

Wal-Mart asserts that the Spikers' claims of negligence and negligent training and supervision against it amount to a wrongful termination claim. The Spikers refer to wrongful termination in their SAC and Mr. Spiker's termination is the alleged harm related to Wal-Mart's conduct. Accordingly, Wal-Mart argues, the Spikers' allegations should be considered under the Arizona Employment Protection Act (the "AEPA") and the requirements to state an AEPA claim under A.R.S. § 23–1501.

The Spikers do not base their claims on the circumstances in which Mr. Spiker was terminated. Instead, they allege that Wal-Mart was negligent in implementing a drug testing program and in supervising and training its service agents which led to a false positive drug test and Mr. Spiker's termination. In other words, the Spikers allege that Mr. Spiker was terminated based on a wrongful drug test and that Wal-Mart's negligent conduct was the cause of the wrongful drug test. Therefore, the Spikers' negligence claims against Wal-Mart are just that. To the extent the Spikers allege wrongful termination in their SAC, (see Doc. 14 ¶ 31), they have disavowed such a claim in their Response to Wal-Mart's Motion, (Doc. 29 at 21), and it is dismissed without prejudice.

## V.   NEGLIGENCE

### A.   Preemption

The Supremacy Clause provides that the United States Constitution and the laws promulgated through its procedures are the supreme law of the land. *See* U.S. Const. Art. VI, cl. 2. Federal law may preempt state law under the Supremacy Clause in three ways: (1) Congress expressly preempts state law; (2) Congressional intent to preempt is inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes. *English v. General Elec. Co.,* 496 U.S. 72, 78–79 (1990). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996). (internal quotation marks and citation omitted). Federal regulations, such as those at issue here, have the same preemptive effect as federal statutes. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699 (1984). Nevertheless, a presumption against the pre-emption of state police power regulations applies to state common law tort claims. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 518 (1992).

#### 1.   Express Preemption

"Because the FOTETA contains an express preemption clause, we focus in the first instance on the plain language of the statute, because it necessarily contains the best evidence of Congress' pre-emptive intent." *Chapman v. Lab One*, 390 F.3d 620, 625 (8th

Cir. 2004). The Act and the regulations implementing it contain express preemption clauses. The Act states, in relevant part:

> A state or local government may not prescribe or continue in effect a law, regulation, standard, or order *that is inconsistent with regulations prescribed under this section.* However, a regulation prescribed under this section may not be construed to preempt a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.

49 U.S.C. § 31306(g) (emphasis added). The DOT regulations provide:

> (a) Except as provided in paragraph (b) of this section, this part preempts any State or local law, rule, regulation, or order to the extent that:
>
> > (1) Compliance with both the State or local requirement in this part is not possible; or
> >
> > (2) Compliance with the State or local requirement is an obstacle to the accomplishment and execution of any requirement in this part.
>
> (b) This part shall not be construed to preempt provisions of State criminal law that impose sanctions for reckless conduct leading to actual loss of life, injury, or damage to property, whether the provisions apply specifically to transportation employees, employers, or the general public.

49 C.F.R. § 382.109 (emphasis added). The Secretary of Transportation has stated that "the purpose of preemption is to avoid the confusion and expense of inconsistent requirements for employers or testing entities that operate in several States and to prevent interference with the functioning of the Federal program by extraneous, burdensome requirements that may defeat its purpose and benefits by making effective implementation difficult or impossible." *Rector v. LabOne, Inc.*, 208 F. Supp. 2d 987, 992 (E.D. Ark. 2002) (quoting *Limitation on Alcohol Use by Transportation Workers,* 59 Fed. Reg. 7302, 7317 (Feb. 15, 1994)). "[A] party claiming preemption under this statute has the burden of demonstrating that the putatively preempted law is 'inconsistent' with the federal regulations." *Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1132, *opinion amended on denial of reh'g,* 350 F.3d 915 (9th Cir. 2003).

The Spikers assert claims of negligence and negligent training and supervision against Wal-Mart. They contend that Wal-Mart breached its duty to exercise reasonable care during the process of implementing and administering a drug testing program, collecting urine samples, preserving a valid chain of custody, and/or otherwise ensuring accurate drug test results. Further, the Spikers allege that Wal-Mart breached its duty to exercise reasonable care during the course of training and supervising BMC and its employees, and ensuring that those employees were properly credentialed in accordance with the DOT regulations. In its Response to Wal-Mart's Motion, the Spikers maintain that their claims "arise entirely out of negligence by Wal-Mart during the selection, training, and supervision of its collection site, BMC."[3] (Doc. 29 at 21.)

The Ninth Circuit has not addressed whether a state law tort claim brought against an employer based on a drug test conducted by a third party is preempted by the FOTETA.[4] The issue then is whether the Spikers' negligence claims against Wal-Mart

---

[3] The Spikers contend that they are "merely seeking to hold Wal-Mart and the other Defendants accountable for their negligent failure to comply with specific federal regulations." (Doc. 29 at 20.) But looking "only at the face of the Complaint", *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002), the Spikers bring claims against Wal-Mart for negligence in conducting the drug testing process and for negligent selection, training, and supervision of the service agents that conducted the drug testing. Thus, the Court will not interpret the Spikers' request as one for "relief under state law for [Wal-Mart's] alleged violations of federal regulations." *Drake*, 458 F.3d at 65.

[4] In suits maintained against laboratories conducting drug tests, the Ninth Circuit and other jurisdictions have held that negligence claims are not preempted. *See, e.g.*, *Ishikawa*, 343 F.3d at 1133–34; *Chapman*, 390 F.3d at 627; *cf. Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 65 (2d Cir. 2006) (preempting claims based on substantive state common law standards but not claims requesting state law remedies for violations of federal law). In *Ishikawa*, an airline employee brought a negligence claim against a drug test laboratory for negligently handling her test specimen. 343 F.3d at 1130. The Ninth Circuit held that the FOTETA did not preempt the claim because its anti-waiver provision provides that "[t]he employee may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling, or analysis of the specimen." *Id.* at 1133 (citing 49 C.F.R. § 40.25(f)(22)(ii) (1998)). The court reasoned that "[n]egligence is a state common law tort, and it would make no sense for the regulation to prohibit requiring the employee to waive negligence claims if those claims were preempted and could not be made. This [anti-waiver provision] implies that such claims exist and are not preempted." *Id.* The court did not find implied preemption because "[d]espite the sensitivity and federal concern with urine testing, . . . . The common law duty to exercise reasonable care to avoid harming people by negligence applies [to such testing]." *Id.* at 1134.

1   seek to impose standards inconsistent with the DOT regulations or serve as an obstacle to

2   the accomplishment and execution of their requirements. *See* 49 U.S.C. §§ 382.109(a)(2),

3   31306(g). The Spikers' claims are based on a theory that Wal-Mart was negligent in

4   implementing and administering its drug testing program and in selecting, training, and

5   supervising the specimen collection site, BMC, and its employees. The DOT regulations

6   state that "[e]ach employer shall ensure that all alcohol or controlled substances testing

7   conducted under this part complies with the procedures set forth in [Part 40]." *Id.* §

8   382.105. The regulations, however, "expressly contemplate[] employer delegation of

9   responsibility for many aspects of testing." *Carroll v. Fed. Exp. Corp.*, 113 F.3d 163, 166

10  (9th Cir. 1997).[5]

11       In that regard, an employer may discharge its responsibilities for ensuring its drug

12  testing program comports with the regulations either by (1) administering its own

13  program within the guidelines of 49 C.F.R. § 40 or (2) hiring qualified service agents to

14  _____

15       The anti-waiver provision central to the Ninth Circuit's preemption analysis in
    *Ishikawa* did not apply to an employer that delegates the drug testing process to a third

16  party. The provision applied to "negligence on the part of any person *participating in* the
    collection, handling, or analysis of the specimen." *Id.* at 1133 (internal citation omitted)

17  (emphasis added). In 2001, the DOT amended the regulations to state that an employer
    could not require a waiver of liability "with respect to any part of the drug or alcohol

18  testing process (including, but not limited to, collections, laboratory testing, MRO and
    SAP services)." 49 C.F.R. § 40.27. That provision, however, was enacted "to ensure that

19  an employer, acting on behalf of a service agent, could not require such a waiver."
    *Chapman*, 390 F.3d at 627. The *Chapman* court further noted that another court "had not

20  take[n] into account the anti-waiver provision" in its analysis because that case involved
    an action against an employer and the provision "is directed to negligence on the part of

21  *others* involved in the collection, handling, and analysis of specimens." *Id.* at 628
    (emphasis added). Wal-Mart was not "involved in the process of collection and analysis",

22  *id.* at 627; the Spikers allege that BMC and eScreen conducted the drug test and reported
    the results to Wal-Mart. Thus the reasoning in *Ishikawa*, also followed by *Chapman*, that

23  negligence claims are not preempted because of the anti-waiver provision, is inapposite
    as to the Spikers' claims against Wal-Mart.

24       [5] In *Carroll*, the Ninth Circuit noted that under the regulations, an employer bears

25  responsibility, inter alia, for the following: maintaining records for purposes of inspection
    by the Federal Highway Administrator, 49 C.F.R. § 382.401; testing a minimum annual

26  percentage of drivers, *id.* § 382.305; testing a driver when the employer has reasonable
    suspicion he or she has violated the prohibitions on controlled substances, *id.* § 382.307;

27  and testing driver-applicants before hiring or using them, *id.* § 382.301. 113 F.3d at 166
    n.2. (citing to prior versions of these provisions).

28

perform testing, see *id.* § 40.15. *Carroll*, 113 F.3d at 166 n.2 (citing to prior versions of these provisions). In 2001, the DOT revised Part 40 and added provisions regarding an employer's responsibility to ensure that its service agents comply with the regulations. Section 40.11 states that an employer is "responsible for all actions of [its] officials, representatives, and agents (including service agents) in carrying out the requirements of the DOT agency regulations." Further, the revised Part 40 states that an employer is "responsible for ensuring that the service agents [it] uses meet the qualifications set forth in this part (e.g., § 40.121 for MROs)." 49 C.F.R. § 40.15(b). It goes on to state that "[an employer] remain[s] responsible for compliance with all applicable requirements of this part and other DOT drug and alcohol testing regulations, even when [it] use[s] a service agent." *Id.* § 40.15(c). But before publishing the revisions, the Secretary clarified that the new provisions do not require employers "to have active monitoring responsibilities with respect to service agents, though employers may choose to monitor their service agents' performance." Dept. of Transp., *Procedures for Transp. Workplace Drug and Alcohol Testing Programs*, 65 FR 79462-01 at 79484 (December 19, 2000). Rather, employers are required "simply to make sure that service agents meet regulatory qualifications. To this end, employers may ask to see documentation from service agents, who are obligated to provide it." *Id.*

Requiring an employer, through common law tort liability, to supervise and train service agents would thus be inconsistent with the DOT regulations. Further, the regulations set out a remedial process if a service agent does not comply with the same in which the DOT may impose sanctions on the employer. 49 C.F.R. § 40.15(c). "State law cannot 'enlarg[e] or enhanc[e]' the regulations to impose burdens more onerous than those of the federal requirements on matters addressed by the federal regulations." *Drake*, 458 F.3d at 65 (quoting *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995)) (preempting claims asserting that conduct addressed by drug testing regulations was "wrongful" under state law though that conduct did not violate the regulations). Wal-Mart hired service agents to administer and conduct its drug testing program. To the

extent the Spikers seek to hold Wal-Mart liable for negligent supervision and training of those agents, such claims are expressly preempted by the FOTETA and dismissed with prejudice.

The Spikers also allege that Wal-Mart was negligent in failing to ensure that BMC was credentialed in accordance with the DOT regulations. As an employer, Wal-Mart is required to "ensur[e] that the service agents [it] uses meet the qualifications set forth in [the regulations]." 49 C.F.R. § 40.15(b). Wal-Mart acknowledges that it is obliged "to choose accredited service agents." (Doc. 37 at 5.) Therefore, the Spikers' claim that Wal-Mart was negligent in fulfilling that requirement is not inconsistent with the regulations. That claim is not expressly preempted by the FOTETA.

### 2.    Implied Preemption

Wal-Mart asserts that the Spikers' claims are preempted due to extensive federal regulation in the arena of drug testing of transportation employees. "[P]reemption may be inferred when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicit congressional intent to displace all state law." *Aguayo v. U.S. Bank*, 653 F.3d 912, 918 (9th Cir. 2011) *cert. denied,* 133 S. Ct. 106, 184 L. Ed. 2d 23 (2012) (internal quotation marks and citation omitted). In its Motion, Wal-Mart largely argues for implied preemption regarding the Spikers' claim that Wal-Mart was negligent in training and supervising BMC. (*See* Doc. 21 at 6–10.)  But as stated above, those claims are expressly preempted by the FOTETA. The remaining claim against Wal-Mart is that it was negligent in verifying that BMC was qualified to serve as a drug testing agent.

"[O]rdinarily when Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when the provision provides a reliable indicium of congressional intent with respect to state authority there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." *Ishikawa,* 343 F.3d at 1133 (internal alterations

and citation omitted). In *Ishikawa,* the Ninth Circuit stated that the FOTETA's provision that expressly preempts state laws inconsistent with the Act, 49 U.S.C. § 31306(g), "impl[ies] that Congress intentionally did not preempt state law generally." *Id.* (internal citation. *Id.* Accordingly, the court held that the "common law duty to exercise reasonable care to avoid harming people by negligence applies" to drug testing of employees unless the imposition of such a duty is inconsistent with the FOTETA. Although *Ishikawa* involved the FAA's implementing regulations, the same rationale applies to the DOT regulations at issue here. Therefore, there is no implied preemption of the Spikers' claim that Wal-Mart was negligent in ensuring that BMC was a qualified service agent.[6][7]

## B.    PRIMA FACIE CASE

Defendants BMC and Padilla, Dr. Kracht, and eScreen move to dismiss the Spikers' negligence claims against them. In Arizona, a plaintiff must prove four elements to state a prima facie case for negligence: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007) (internal citations omitted). The existence of a duty is a matter of law for the Court's determination. *Id.* (internal citations omitted). The other elements, including breach and causation, are factual issues usually decided by the jury. *Id.* (internal citations omitted).

### 1.    Duty

"Whether the defendant owes the plaintiff a duty of care is a threshold issue;

---

[6] In its Reply, Wal-Mart also argues that the Spikers' claims are preempted by the AEPA, A.R.S. § 23–2501, *et seq.* But the Court need not consider that argument because it was not made in the Motion. *See Delgadillo v. Woodford,* 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed waived.").

[7] Wal-Mart contends, in its Reply, that to the extent the Spikers claim reputational damages against Wal-Mart based on the positive drug test result, that claim is preempted by the DOT regulations. The Court also declines to consider that contention because it was not included in the Motion.

absent some duty, an action for negligence cannot be maintained." *Id.* (internal citations omitted). Whether a duty exists is a matter of law for the Court to decide. *Lips v. Scottsdale Healthcare Corp.*, 224 Ariz. 266, 268, 229 P.3d 1008, 1010 (2010). If the Court holds that no duty exists, "the defendant is not liable even though he may have acted negligently in light of the foreseeable risks." *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 356, 706 P.2d 364, 368 (1985); *see Gipson*, 214 Ariz. at 143–44. In determining the whether a duty exists, "the question is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz*, 146 Ariz. at 356.

The Arizona Supreme Court has held that a duty of care may arise from, among other sources, special relationships based on contract, family relations, or conduct undertaken by the defendant, public policy to prevent future harm, or the existence of a statute criminalizing conduct. *Gipson*, 214 Ariz. at 145–46 (internal citations omitted). Foreseeability of harm, however, is not a factor to be considered when making determinations of duty. *Id.* at 144; *Ritchie v. Krasner*, 221 Ariz. 288, 298, 211 P.3d 1272, 1282 (Ct. App. 2009). In determining the existence of a duty, "the requirement of a formalized relationship between the parties has been quietly eroding" in Arizona. *Stanley v. McCarver*, 208 Ariz. 219, 221–22, 92 P.3d 849, 851–52 (2004) (internal citations omitted). "When public policy has supported the existence of a legal obligation, courts have imposed duties for the protection of persons with whom no preexisting relationship existed." *Id.* In addition, courts may consider "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Wertheim v. Pima Cnty.*, 211 Ariz. 422, 427, 122 P.3d 1, 6 (Ct. App. 2005) (internal citations omitted).

Whether service agents, such as collectors and their employees, MROs, and third-party administrators, owe a duty of care to an employee whose specimen they collect and test at the request of an employer is an issue of first impression in Arizona. "In the

absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) (internal citations omitted). "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." (*Id.*) (internal citations omitted). While Arizona courts "are not bound by the law as announced in other jurisdictions, [they] may look to those jurisdictions for guidance on this issue." *State v. Emerson*, 171 Ariz. 569, 571, 832 P.2d 222, 224 (Ct. App. 1992); *Shulansky v. Michaels,* 14 Ariz. 402, 405, 484 P.2d 14, 17 (Ct. App. 1971) ("[The court] may therefore look to decisions from sister states in search of commonlaw rules.") (internal citations omitted). The Court will analyze the existence of a duty of reasonable care in relation to each type of service agent in turn.

### i.        BMC and Padilla

In their Motion, BMC and Padilla do not challenge the existence of a duty of care to Mr. Spiker. The existence of a duty, however, must be determined prior to addressing the question of whether there was a breach of that duty causing the alleged harm. Therefore, the Court considers whether BMC and Padilla owed a duty of care to Mr. Spiker.

Upon receiving a specimen from an employee, a collector prepares the specimen for testing and completes a CCF to record the chain of custody until the specimen is sent to a laboratory for testing. *See generally* 49 C.F.R. §§ 40.41–40.73. Arizona courts have not addressed whether a collector owes a duty to an employee whose specimen it prepares. But other jurisdictions recognize a duty of care that extends either from a collector or laboratory to an employee even if that service agent performs its role at the request of an employer. *See Cooper v. Lab. Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379 (4th Cir. 1998) (collecting cases); *Santiago v. Greyhound Lines, Inc.,* 956 F. Supp. 144, 152 (N.D.N.Y. 1997); *Quisenberry v. Compass Vision, Inc.*, 618 F. Supp. 2d 1223, 1228–31 (S.D. Cal. 2007); *Chapman v. Labone,* 460 F. Supp. 2d 989, 1001 (S.D. Iowa 2006). *But see, e.g., Tricoski v. Laboratory Corp. of Amer.,* 216 F. Supp. 2d 444, 445–46

(E.D. Pa. 2002); *Ney v. Axelrod,* 723 A.2d 719, 722 (Pa. Super. Ct. 1999).

The rationale in cases that hold that a laboratory owes a duty of care to an employee is germane to the issue of whether a collector owes a similar duty. Both collectors and testers are required to ensure the integrity and accuracy of the drug testing process and must be qualified to do so. *See* 49 C.F.R. §§ 40.31, 40.81. In *Ishikawa,* an employee alleged that a laboratory's negligence in conducting her drug test led to her termination. 343 F.3d at 1130–31. Importantly, after holding that the employee's negligence claim was not preempted, the Ninth Circuit noted that the "common law duty to exercise reasonable care to avoid harming people by negligence" applied to a laboratory's testing and reporting of results related to an employee's specimen. *Id.* at 1134. Along with authorities in other jurisdictions, *Ishikawa* demonstrates that in Arizona a collector owes a duty of care to an employee whose specimen it prepares.

Arizona courts consider the state's public policy to prevent future harm in determining whether a duty of care exists. *Gipson*, 214 Ariz. at 145 (citing *Stanley*, 208 Ariz. at 221). Public policy warrants the imposition of a duty on collectors to prepare specimens with reasonable care. There is great risk of harm to an employee from a specimen that is prepared in a negligent manner. *See Elliott v. Lab. Specialists, Inc.,* 588 So.2d 175, 176 (La. Ct. App. 1991) (finding that the "risk of harm in our society to an individual because of a false-positive drug test is so significant that any individual wrongfully accused of drug usage by his employer is within the scope of protection under the law"). As is the case for Mr. Spiker, an employee may be terminated if there is a false positive drug test report. The employee may also be significantly hindered in his or her efforts to find other employment because of the report. Further, a collector is in a better position "to guard against the injury" as it is solely responsible for the preparation of specimens. *See Stinson v. Physicians Immediate Care, Ltd.*, 269 Ill. App. 3d 659, 664–65 (Ill. Ct. App. 1995) (applying that rationale to a laboratory's position in the process). In addition, the collector, which is compensated for preparing the specimens, "is better able to bear the burden financially than the individual wrongly maligned by a false positive

- 17 -

report." *Id.*

If there was no duty of care imposed on a collector, numerous employees would be left without an opportunity to redress a drug test based on a negligently prepared specimen and the severe consequences for employees from a false positive report resulting from such a test. Importantly, the DOT regulations contemplate the existence of claims brought by employees against service agents such as collectors. Employers and service agents are prohibited from requiring an employee "to sign a consent, release, waiver of liability, or indemnification agreement with respect to any part of the drug or alcohol testing process covered by this part (including, but not limited to, collections, laboratory testing, MRO, and SAP services)." 49 C.F.R. §§ 40.27, 40.355(a). Thus, public policy supports holding a collector "accountable to the individuals whose specimens it [collects]." *Quisenberry*, 618 F. Supp. 2d at 1230 (internal citation omitted).

### ii.     Dr. Kracht

As an MRO for eScreen, Dr. Kracht was responsible for reviewing Mr. Spiker's specimen. Under the DOT regulations, an MRO provides a quality assurance review of the drug testing process for the specimens under the MRO's purview. 49 C.F.R. § 40.123(b). In that role, an MRO evaluates the CCF for each specimen to determine whether there is a flaw that may cause a test to be cancelled, determines whether there is a legitimate medical explanation for confirmed positive drug test results, and provides feedback to employers, collection sites and laboratories regarding performance issues where necessary. *Id.* § 40.123(b)(1)–(2), (c).

Dr. Kracht contends that he did not owe a duty of care to Mr. Spiker because in reviewing Mr. Spiker's positive drug test, he acted for the benefit of Mr. Spiker's employer, Wal-Mart, and not for benefit of Mr. Spiker. In support, Dr. Kracht relies on *Hafner v. Beck*, 185 Ariz. 389, 916 P.2d 1105 (Ct. App. 1995), in which the plaintiff brought a negligence claim against a psychologist that conducted an independent medical examination of the plaintiff on behalf of his employer's workers' compensation carrier. The court held that the psychologist did not owe the plaintiff a duty of care because "a

- 18 -

medical malpractice suit such as this will lie only when there was a doctor/patient relationship creating a duty to act for the patient's benefit." *Id.* at 391. In *Diggs v. Arizona Cardiologists, Ltd.*, however, the Arizona Court of Appeals characterized the holding in *Hafner* as on the "narrow basis" that "a doctor who conducts an independent medical examination and does not 'intend to treat, care for or otherwise benefit the employee' has no duty to that person." 198 Ariz. 198, 201, 8 P.3d 386, 389 (Ct. App. 2000) (quoting *Hafner*, 185 Ariz. at 392). The Court further noted that *Hafner* "states that because the defendant rendered no treatment, the relationship between the parties was so attenuated that, for policy reasons, the plaintiff was not entitled to protection." *Id.*

*Hafner* is inapposite in these circumstances. This case involves a termination based on a drug test that the Spikers claim was negligently reviewed by the MRO assigned with the responsibility to verify drug test results. Under the federal regulations, an MRO such as Dr. Kracht is to "act[] as an independent and impartial 'gatekeeper' and advocate for the accuracy and integrity of the drug testing process." 49 C.F.R. § 40.123(a). The MRO provides a conclusive check by validating all drug test results that he or she receives from the laboratory. In fact, an employer may not remove an employee from the performance of safety-sensitive functions until the MRO has completed verification of a positive drug test result. One of the reasons for requiring such verification is to avoid the "unfair stigmatization of an employee as a drug user." Dep. of Transp., *Procedures for Transp. Workplace Drug and Alcohol Testing Programs*, 65 FR 79462-01 at 79463. In mandating MRO review, the Secretary attempts to reach a "regulatory balance between safety interests and the protection of employees from unfair consequences of the process." *Id.* at 79464. Thus, the MRO review process is in part for the benefit for the employee.

Even if it was not, there is a relationship between the MRO and an employee whose specimen the MRO reviews entitling the employee to protection under the law. Further, the Court has determined that a collection site owes a duty to an employee; there is no reason to distinguish a MRO that verifies a drug test based on the specimen from

the site that collects the specimen. Both types of service agents play a vital role in ensuring that test results are reported accurately to employers as such results are "often a pre-requisite to being hired, promoted, or even continuously employed." *Quisenberry*, 618 F. Supp. 2d at 1230 (noting that in cases of inaccurate reporting, "[e]mployees can lose their jobs, and job applicants can miss out on an opportunity to be considered for a new position or a well-deserved promotion."). Therefore, the Court concludes that an MRO owes a duty of care to an employee whose specimen the MRO reviews.

### iii.    eScreen

The Spikers assert that as a TPA of Wal-Mart's drug testing program, eScreen was responsible for selecting, hiring, training, and/or supervising the site that collected the drug test specimens from employees, and the MROs that verified drug test results. The Spikers seek to hold eScreen primarily liable for failing to ensure that BMC and its employees were properly credentialed and trained pursuant to the DOT regulations and vicariously liable for Dr. Kracht's allegedly negligent review and verification of the drug test results.

eScreen contends that any duty of care in selecting a collector that employed personnel who were properly credentialed and trained ran only to Wal-Mart and not Mr. Spiker. In administering the drug testing program on behalf of an employer, a TPA plays a critical role in ensuring that the service agents that conduct the tests comply with the DOT regulations. The regulations themselves do not make distinctions among service agents and state that "[a]s a service agent, the services you provide to transportation employers must meet the requirements of . . . the DOT agency drug and alcohol testing regulations." 49 C.F.R. § 40.341. As discussed above, there are sufficient reasons to hold service agents accountable to employees for proper drug testing even if they are serving employers. Thus, taking the allegations in the SAC as true, the Court holds that eScreen owed a duty of care to Mr. Spiker.

/ / /

/ / /

**2.    Breach**

**i.    Standard of Care**

"[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." Restatement § 282. Even if a person owes a duty of care to another, it is a distinct issue whether the standard of reasonable care has been met in a particular case. That standard has been defined as "[w]hat the defendant must do, or must not do . . . to satisfy the duty." *Gipson v. Kasey*, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007) (internal citations omitted). Whether the defendant has met the standard, or in other words, whether there has been a breach of duty, is an issue of fact determined by the specifics of the individual case. *Id.* The Court may, however, "rule as a matter of law when no reasonable juror could conclude that the standard of care was breached . . . ." *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 216 Ariz. 454, 458, 167 P.3d 711, 715 (Ct. App. 2007) (internal quotation marks and citations omitted).

The standard of reasonable care may be established by (1) statute or regulation; (2) adopted by the Court from a statute or regulation; (3) established by judicial decision; or (4) applied to the facts of the case. Restatement § 285. Here, the conduct of service agents is governed by the FOTETA and DOT regulations. The Restatement states that a court may adopt as the standard of care the requirements of a statute or regulation whose purpose is exclusively or in part:

> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Restatement § 286; *see Tellez v. Saban*, 188 Ariz. 165, 169, 933 P.2d 1233, 1237 (Ct. App. 1996) (citing the Restatement elements). The purpose of a statute may be

- 21 -

determined by reference to its title, preamble, detailed provisions, or history, among other sources. Restatement § 286 cmt. f. The express purpose of the FOTETA is "to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles." 49 C.F.R. § 382.101. Further, the implementing regulations were prescribed by the DOT "[i]n the interest of commercial motor vehicle safety." *Id.* § 31306(b). As discussed above, the regulations aim to achieve a regulatory balance between safety interests and the protection of employees. The purpose of the regulations, however, is to protect the public at large and not to protect employees such as Mr. Spiker who are tested according to the requirements set out therein. The regulations do not set out the minimum standard of care to determine whether there has been a breach of the duty of care owed to an employee. *See Drake*, 458 F.3d at 57 ("Although they set out elaborate rules for conducting drug tests, the DOT regulations do not specifically address negligence on the part of drug-testing laboratories or otherwise establish the minimum standard of care to be exercised by laboratory personnel.").

Service agents generally "owe[] a duty of reasonable care to persons whose specimens [they] test[] for employers or prospective employers." *Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill. App. 3d 659, 665 (1995); *see Ishikawa*, 343 F.3d at 1134 (noting that "the "common law duty to exercise reasonable care to avoid harming people by negligence" applies to service agents). Further, for those with special skills or training, the standard of care imposes "the higher obligation to act in light of that skill, training, or knowledge." *Stanley*, 208 Ariz. at 224. The DOT regulations state that service agents must ensure "the services [they] provide to transportation employers . . . meet the requirements of this part and the DOT agency drug and alcohol testing regulations." 49 C.F.R. § 40.341. The regulations also require service agents to be qualified and their personnel to meet training requirements as outlined therein. *See, e.g., id* §§ 40.33 (collector), 40.41 (collection sites), 40.121 (MRO). Thus, service agents must act with reasonable care in light of that training when conducting drug tests. Although the DOT

regulations do not set out the minimum standard of care and a violation of their requirements is not negligence per se, the regulations provide guidance as to the standard of reasonable care.

### ii.      BMC and Padilla

In their SAC, the Spikers allege that BMC and Padilla failed "to ensure that Mr. Spiker's sample was validly collected, labeled, stored, shipped, and/or tested." (Doc. 14 ¶ 36.)  The factual allegations are (1) that Padilla did not place a tamper-evident seal onto Mr. Spiker's specimen bottle before Mr. Spiker initialed it as required by Section 40.71, (*id.* ¶ 37), and (2) that Padilla was not properly credentialed and trained as collectors as required by Section 40.33, (*id.* ¶¶ 38, 75–77).

BMC and Padilla contend that the Spikers' allegation that Padilla affixed the seal after Mr. Spiker initialed it is controverted by Mr. Spiker's certification on a CCF. Defendants attach that CCF to their Motion. The certification on the signed CCF by Mr. Spiker states: "I certify that each specimen bottle used was sealed with a tamper-evident seal in my presence." (Doc. 20-1, Ex. 1.) Even if the Court were to consider the CCF on a motion to dismiss, Mr. Spiker's certification directly contradicts the Spikers' allegation in the SAC that Padilla affixed the seal on the specimen after Mr. Spiker initialed it. Further, the SAC can be read to allege that regardless of the CCF certification, the seals were not affixed in Mr. Spiker's presence. These factual disputes are not properly determined at this stage of the proceedings.

BMC and Padilla contend that even if Padilla did not follow the mandated procedure, the labeling and sealing were "substantially correct" so that her deviation does not amount to a breach. Defendants assert that incorrect sealing is a mere "procedural error" and is not one of the four "fatal flaws" the DOT regulations list that require a drug test to be cancelled. *See* 40 C.F.R. § 40.199.[8] Although the regulations are not dispositive

---

[8] The following are the fatal flaws:

(1) There is no printed collector's name and no collector's signature;

(2) The specimen ID numbers on the specimen bottle and the CCF do not

as to what conduct constitutes a breach, they are persuasive as to reasonable behavior in this highly regulated area of drug testing. A drug test is not cancelled even if the employee does not initial the tamper-evident seals at all; rather, the collector is required to note this failure to initial in the "Remarks" line of the CCF and complete the collection process. *Id.* § 40.71. The proper sealing of a specimen, however, is essential to the chain of custody process that ensures the integrity of the specimen. *See* § 40.199(3) (stating that one of the fatal flaws is a broken specimen bottle seal or evidence of tampering with the seal). The collector is held to the higher obligation to act in light of mandated training to properly seal drug test specimens. Further, the CCF requires the collector to attest to the fact that the specimen was sealed in accordance with the DOT regulations. (*See* Doc. 20-1, Ex. 1.) If there is no such attestation, the test is cancelled by the MRO. *Id.* § 40.199(1). Because proper sealing procedure is important to maintain a reliable chain of custody and incorrect sealing is alleged in the SAC, the alleged facts thus state a breach of the duty of reasonable care.

The Spikers also allege that Padilla was not properly credentialed and trained as a collector as required by the DOT regulations. Only collectors that meet the training requirements set out in the regulations are authorized to collect specimens for DOT drug testing. *Id.* § 40.31(a)–(b). Section 40.33 lists several training requirements for collectors including qualification training, an initial proficiency demonstration, refresher training, error correction training, and documentation. In light of the public policy embodied in the

match;

(3) The specimen bottle seal is broken or shows evidence of tampering (and a split specimen cannot be redesignated, see § 40.83(g)); and

(4) Because of leakage or other causes, there is an insufficient amount of urine in the primary specimen bottle for analysis and the specimens cannot be redesignated (see § 40.83(g)).

49 C.F.R. § 40.199.

regulations to require all collectors to be qualified, Defendants' duty of reasonable care obliges them to comply with those requirements. The SAC alleges facts to make the reasonable inference that Padilla did not comply with the training requirements. For example, the Spikers allege that Padilla did not follow the sealing procedure outlined in the regulations and that she was not properly credentialed and trained when she collected Mr. Spiker's specimen. BMC was allegedly responsible for supervising and training Padilla. Therefore, the Spikers, at this point, have sufficiently alleged that BMC and Padilla breached their duties of care.

### iii.    Dr. Kracht

As discussed above, the MRO serves an important role in ensuring the reliability of the drug testing program. The Spikers allege that Dr. Kracht breached his duty of care by not fulfilling his oversight function under the regulations as to Mr. Spiker's specimen. Assuming Dr. Kracht's duty to Mr. Spiker obligated him to fulfill that function, the Spikers' allegations are conclusory and do not provide factual allegations to draw the inference that Dr. Kracht breached his duty.

The Spikers allege that Dr. Kracht (1) "failed to take reasonable steps to execute his duties as MRO and failed to ensure that Mr. Spiker's urine sample was validly collected, labeled, stored, shipped and/or tested", (Doc. 14 ¶ 39); (2) "did not satisfy the required credentials, basic knowledge, training, and responsibilities outlined in the federal regulations", (*id.* ¶ 40); (3) "failed to act as an 'independent and impartial gatekeeper and advocate for the accuracy and integrity of the drug testing process'", (*id.* ¶ 41) (quoting 49 C.F.R. § 40.123(a)); (4) "failed to properly investigate obvious discrepancies in the chain of custody of Mr. Spiker's urine sample", (*id.* ¶ 64); and (5) "failed to properly investigate obvious problems with the credentials and training of BMC's employees, including Defendant Padilla", (*id.* ¶ 65). But there are no allegations as to how Dr. Kracht failed in these respects. The Spikers do not state how Dr. Kracht lacked the requisite credentials or training and failed his gatekeeping role, what discrepancies he failed to investigate, or what "obvious problems" he overlooked as to

the qualifications of BMC's employees.

The only plausible "discrepancy" in the chain of custody to which the Spikers may be referring is the incorrect sealing by Padilla discussed above. But during a quality assurance review of specimens, the MRO is charged only with reviewing the CCF "for the purposes of determining whether there is a problem that may cause a test to be cancelled." 49 C.F.R. § 40.123(b)(1). The Spikers do not allege that Dr. Kracht failed to review the CCF, ignored one of the four fatal flaws that would require a test to be cancelled, or that the CCF was lacking in any respect. Although the regulations do not determine the standard of care, the MRO is their creation. They do not make the MRO responsible for reviewing any and all discrepancies in the chain of custody. Because the Spikers do not allege other facts that Dr. Kracht breached his duty, their negligence claim against him is dismissed with leave to amend.

### iv.    eScreen

The Spikers allege that eScreen was negligent in selecting, hiring, and training and/or supervising BMC, Padilla, and Dr. Kracht. The Spikers have alleged facts that BMC and Padilla breached their duties of reasonable care through incorrect sealing and lack of training. Because the Spikers also allege that eScreen handled the selection, hiring, training, and/or supervision of BMC, they allege facts that eScreen breached its duty of care to supervise and train BMC and Padilla. As to Dr. Kracht, however, the SAC does not sufficiently allege that he breached his duty of reasonable care; therefore, it does not state a negligence claim against eScreen for its supervision of Dr. Kracht.

### 3.    Causation

Arizona law holds that causation exists "if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983) (internal citation omitted). Defendant's act need not have been a "large" or "abundant" cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed "only a little" to plaintiff's injuries. *Id.* (internal citation

omitted). Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred. *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990) (internal citation omitted).

The Spikers allege causation. They allege that Padilla's incorrect sealing and lack of training caused Mr. Spiker's specimens to be contaminated or mistakenly identified, resulting in a false positive drug test. That test led to Mr. Spiker's termination of employment. Further, eScreen's and BMC's alleged failure to properly supervise and train Padilla led to her misconduct. Because the Spikers allege causation, they state a prima facie case for negligence against eScreen, BMC, and Padilla.

## VI.   OTHER PLEADED CLAIMS

BMC and Padilla contend that the Spikers have not stated claims for defamation and negligent infliction of emotional distress. The Spikers allege in their SAC that "Defendants' negligence also . . . defamed Mr. Spiker's public and professional reputation" and that "Defendants' negligence has caused . . . emotional distress . . . ." (Doc. 14 ¶ 53–54.) In their Response, the Spikers state that they do not allege claims for defamation or negligent infliction of emotional distress. Those terms are alleged in the SAC as damages relating to Defendants' negligent conduct and not as separate claims. To the extent the SAC purports to state claims for defamation and negligent infliction of emotional distress, they are dismissed from this action.

## CONCLUSION

The FOTETA preempts the Spikers' claims against Wal-Mart for negligent training and supervision but does not preempt their claim that Wal-Mart was negligent in selecting qualified service agents to implement its drug testing program. As to the negligence claims against the service agents, the agents owed a duty of reasonable care to Mr. Spiker. The SAC does not allege that Dr. Kracht breached his duty of care. It does allege that Padilla, eScreen, and BMC, through their deficient supervision and training of Padilla, breached that duty. Padilla did not follow the proper sealing procedure outlined in the DOT regulations and was not trained by eScreen and BMC pursuant to the

regulations. The SAC further alleges that the incorrect sealing and lack of training caused Mr. Spiker's injury, namely, a false positive drug test report and subsequent termination from employment. The Spikers thus state claims of negligence against eScreen, BMC, and Padilla, but not against Dr. Kracht.

**IT IS THEREFORE ORDERED** that the Motion to Dismiss of Defendants Stephen Kracht, D.O., and eScreen (Doc. 19) is **granted in part and denied in part**. The claims against Defendant Kracht are dismissed with leave to amend. If Plaintiffs do not move to amend the Second Amended Complaint as to their allegations against Defendant Kracht **within thirty (30) days,** the Clerk of the Court is directed to terminate Defendant Kracht from this action.

**IT IS FURTHER ORDERED** that the Motion to Dismiss for Failure to State a Claim of Defendants Buckeye Medical Center and Padilla (Doc. 20) is **denied**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss Second Amended Complaint of Wal-Mart (Doc. 21) is **granted in part and denied in part**.

Dated this 16th day of September, 2013.

_G. Murray Snow_
G. Murray Snow
United States District Judge